# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**MELVIN H. HERT,**

    **Plaintiff,**

**v.**                        **Case No.  8:08-cv-233-T-30MAP**

**PRUDENTIAL INSURANCE COMPANY
OF AMERICA,**

    **Defendant.**

_____/

## ORDER

THIS CAUSE comes before the Court upon Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law (Dkt. #26), Notice of Filing Attachments (Dkt. #27), and Plaintiff's Response to Defendant's Motion for Summary Judgment (Dkt. #29). The Court, having considered the motion, response, memoranda, administrative record, affidavits, and being otherwise advised in the premises, concludes that Defendant's motion should be granted in part and denied in part.

## I.    Relevant Background Facts.

This action is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"). Plaintiff Melvin H. Hert ("Plaintiff" or "Hert") seeks to overturn Defendant Prudential Insurance Company of America's ("Defendant" or "Prudential") decision, as a claim administrator of an employee welfare benefit plan, to deny his claim for continued long term disability ("LTD") benefits.

In 1973, while serving in the United States Army, Plaintiff injured his cervical and lumbar spine. Plaintiff received Disabled Veteran's Benefits - 40% disability rating for the lumbar injury and 30% for the cervical injury. Plaintiff recovered from these injuries sufficiently to attend college, receiving a degree in Business Management from Louisiana Tech in 1980, and a degree in Business Administration from Louisiana State University in 1981. In 1997, Mr. Hert was involved in another motor vehicle accident, in which he re-injured his lumbar spine. In 1999, he suffered a left knee injury after falling. In March of 2003, he sustained another work related injury to his left shoulder, neck, and back while carrying equipment. Plaintiff was evaluated at Tampa Pain Relief as of August 2003 and was treated with injections. Plaintiff's symptoms have progressed over time, with significant deterioration occurring from 2003 to present.

From 1998 to 2004, Plaintiff was employed as a Franchise Development Manager with Carlson Wagonlit Travel ("Wagonlit") in Tampa, Florida. Incident to his employment, Plaintiff participated in Wagonlit's employee welfare benefit plan with LTD benefits underwritten by Prudential. On March 3, 2004, Plaintiff's treating physician placed him on "light duty" work with the following restrictions: "No lifting over ten pounds, no repetitive bending, twisting, climbing or carrying. No prolonged standing or sitting without a five minute break every hour to stretch."[1] Plaintiff left his regular occupation on March 29, 2004, due to neck pain, back pain, and depression. At the time, Plaintiff was 53 years old.

---

[1] Dkt. #27, Administrative Record ("R"), pp. 495, 365, and 368.

On July 15, 2004, Plaintiff had MRIs performed on his cervical and lumbar spines which revealed disc herniations at C2-3, C6-7 without neural impingement and disc degeneration and herniation at L4-5. On August 31, 2004, Dr. Gene A. Balis of Neurological Surgery Associates reported that the July 15, 2004 MRI of the cervical spine showed severe degenerated disc disease with bulges at C5-6 and C6-7 causing flattening of the thecal sac. Degenerated disc disease was also noted to be present at C7-T1 with a bulge flattening the thecal sac at C3-4 and C4-5. With respect to the lumbosacral spine, Dr. Balis reported there was a large bulge and a protruding disc at L4-5 with moderate stenosis and hypertrophy of facets and that there was degenerative disc disease throughout the lumbosacral spine.

On September 10, 2004, Plaintiff submitted a claim for LTD benefits. Plaintiff was told by his employer that they did not have any employment opportunities that matched his light duty work restrictions, and therefore, his employer placed him on a Full Medical Leave of Absence. Based on impairment from Plaintiff's regular occupation and his employer's inability to accommodate the restrictions and limitations provided by his treating physician, on October 19, 2004, Plaintiff's claim for LTD benefits was approved, effective September 25, 2004.

On November 16, 2004, Plaintiff executed a Reimbursement Agreement which stated, "[i]f any benefits under the Social Security Act are awarded retroactively, [Hert] agree[s] to

repay Prudential immediately the amount paid to [him] under this Agreement in excess of the amount to which [Hert] would have been entitled under the terms of the Plan."[2]

In February of 2005, a Prudential employee spoke with Plaintiff by telephone and asked if he would be interested in Prudential's vocational assistance program, to which Plaintiff responded in the affirmative.  In March of 2005, Prudential informed Plaintiff that his case was being referred to Kirchner & Associates, Inc. for a vocational analysis.

As of May 16, 2005, Plaintiff's treating physician, Dr. McKitrick, continued to describe Plaintiff's work status as "light duty" with similar restrictions that were assessed in 2004:

> Limited use and repetitive movements requiring left upper extremity and shoulder, in particular limit use of left upper extremity to less than 90 degrees at shoulder.  Do not lift over 10 pounds.  No repetitive bending, stretching or twisting.  No prolonged standing, sitting longer than one hour without a five minute break to stretch.

On May 21, 2005, Phaela Kirchner of Kirchner & Associates, performed the independent vocational assessment with return-to-work recommendations.  As part of her assessment, Ms. Kirchner performed a Transferrable Skill Analysis using a computerized program which was adjusted to reflect sedentary strength, as well as occasional stooping, bending and reaching, and the following alternative occupations were identified at the highest level of transferability: Sales Manager, Funds Development Director, Research and Development Director, and Financial Planner.

---

[2] *Id.*, pp. 337-338.

On June 11, 2005, Ms. Kirchner, submitted a closure report to Prudential which revealed that Plaintiff had applied for accounting courses at the University of South Florida and that Plaintiff believed he could work as an accountant. Plaintiff did indeed register for accounting classes during the fall semester of 2005, but was forced to withdraw from all classes by the end of the semester. Plaintiff claims he was unable to maintain the constant focus and memory retention that was required to keep up with class assignments as well as the traveling, sitting, carrying type activities that were required to attend classes.

Throughout 2005, Plaintiff continued to receive medical treatment for his back condition, including numerous pain management medications as well as multiple nerve block injections.

On March 9, 2006, Prudential advised Plaintiff via a letter that the standard to qualify for LTD benefits changed after one had received benefits for two years. It became more restrictive pursuant to the Plan. The Policy states, in pertinent part:

**How does Prudential Define Disability?**

You are disabled when Prudential determines that:

- You are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and
- you have a 20% or more loss in your indexed monthly earnings due to that sickness or injury.

After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties or any gainful occupation for which you are reasonably fitted by education, training or experience.

Plaintiff is required to provide proof of his claim, which must show:

(1) That you are under the regular care of a doctor.
(2) The appropriate documentation of your monthly earnings.
(3) The date your disability began.
(4) Appropriate documentation in the disabling order.
(5) The extent of your disability, including restrictions and limitations preventing you from performing your regular occupation or gainful occupation.
(6) The name and address of any hospital or institution where you received treatment, including all attending doctors.
(7) The name and address of any doctor you have seen.[3]

* * *

Disabilities which, as determined by Prudential, are due in whole or in part to mental illness have a limited pay period during your lifetime.[4]

In response to Prudential's letter, On April 4, 2006, Plaintiff sent a letter to Prudential as well as his Claimant Statement and various medical records from Dr. Lance McKitrick, his treating physician and Dr. Eric Garcia, his internist. Plaintiff submitted a letter from Dr. Garcia dated January 4, 2006, stating, in pertinent part:

Due to the persistent reoccurrences of debilitating symptoms as a result of a Cervical Spine Injury of two herniated disc at C2-3 and C6-7 and a Lumbar Spine Injury of one herniated disc at L4-5 in 2003 and 2004, my patient, Mr. Melvin Hert is permanently disabled. These injuries prevent Mr. Hert from maintaining full-time or part-time employment and significantly limit his physical abilities to perform many activities of daily living and personal care.[5]

In September 2006, Prudential received and reviewed records from Dr. Michael Weitzner, The Helios Pain & Psychiatry Center. In a faxed letter dated September 26, 2006, Dr. Weitzner states:

---

[3] *Id.*, R, 695.

[4] *Id.*, R, 689.

[5] *Id.*, p. 276.

I am writing this letter at Mr. Hert's request. He has been under my medical care since March 14, 2005, for pain related injuries (i.e., cervical and lumbar herniated discs and myelopathy) that he sustained during his employment as a Franchise Development Manager for the Results Travel Agency Franchise Brand of Carlson Companies, Inc. As a result of the injuries, he has reoccurring episodes of pain, numbness, and weakness in his arms and legs as well as pain in his neck and lower back. He also has additional debilitating symptoms including hearing loss in both ears due to constant ringing sounds, headaches, blurred vision, depression, anxiety, all compounded by fatigue and sleep deprivation.

These employment-related injuries and reoccurring debilitating symptoms prevent Mr. Hert from maintaining both part-time and full-time employment. In addition, they significantly limit his daily physical, mental, and emotional functioning, thus, preventing him from performing many of his activities of daily living and personal care. Mr. Hert is on pain medication as well as antidepressant medication to manage these myriad of problems and he will continue to be provided with ongoing pain management as well as psychiatric and psychological care. However, he remains disabled at this time for an indefinite time and it is my medical opinion that he is not able to work at any position at this time. I recommend an indefinite extension of Long-term Disability benefits through your company.[6]

The next day, Prudential acknowledged receipt of the letter from Dr. Weitzner but terminated Plaintiff's claim effective September 25, 2006, based on its determination that Plaintiff no longer met the definition of being disabled. Prudential claimed Plaintiff failed to submit sufficient evidence of his inability to perform the duties of "any gainful occupation."[7]

---

[6] *Id.*, R, p.188.

[7] *Id.*, R, pp.595-597.

On October 17, 2006, Plaintiff appealed Prudential's decision to terminate his LTD benefits. Plaintiff again submitted medical records from Dr. Weitzner, Dr. Guirguis, and Dr. Garcia. These records were duplicate copies of records already contained in Prudential's file.

Prudential referred the entire file for an independent file review with Christopher Pasquale, M.D., Diplomat of the American Board of Pain Medicine, Board Certified, American Board of Physical Medicine and Rehabilitation, and a second Independent Multi-disciplinary Panel Review for Psychiatry and Physical Medicine and Rehabilitation, Pain Management with Stuart Shipko, M.D., American Board of Psychiatry and Neurology.

On December 1, 2006, Dr. Pasquale provided an 8 page report which stated that Plaintiff indeed has evidence of functional impairments .[8]  Dr. Pasquale's report states, in pertinent part, that "from a musculoskeletal perspective, he did have findings of ongoing pain complaints, specifically due to underlying cervical spondylosis and a herniated disc at the C6-7 level causing ongoing complaints of pain and left upper extremity pain."[9]  The report further states, in pertinent part:

> Needle EMG examination of November 29, 2005, denoted denervation in the left C6-7 nerve root consistent with the clinical descriptions provided throughout the medical records and likewise consistent with Mr. Hert's pain complaints.  Such findings are a source of impairment from a musculoskeletal perspective, however, taking into consideration his depressive symptomatology according to Dr. Shipko (psychiatrist), this does not lead to a further degree of impairment.
>                                                        * * *

---

[8] *Id.*, R, pp. 126-133.

[9] *Id.*, R, p. 130.

<u>CONCLUSION</u>

1.    **Based on the documentation reviewed, does Mr. Hert have current functional impairment(s) from March 28, 2006 forward, from any one condition or combination of conditions? If so, please list the functional impairment(s) and the evidence supporting you opinion.**

From a musculosketal perspective, Mr. Hert has a significant history for which he will have evidence of ongoing impairment presently and on a permanent basis. He has a longstanding history relating to the cervical spine of lower cervical spondylosis and disc herniations, particularly at the level of C2-3 and C6-7 without neural impingement. Particularly as noted by Dr. Callahan on September 1, 2005, he had continued complaints of neck and shoulder pain (left side) with radiation into the left arm. He does have recent imaging study findings of December 3, 2005, of the cervical spine revealing focal disc herniation at the level of C2-3 and C6-7. The imaging studies do reveal multiple spondylosis consistent with clinical description and his complaints. As noted, he also had complaints of left shoulder pain and an MRI was performed in December of 2005. This did reveal a small partial undersurface tear involving the distal supraspinatus tendon. . .Mr. Hert does have evidence of impairment at the present time which will be chronic due to the findings of spondylosis and resulting range of motion deficits with pain complaints into the left upper extremity consistent with imaging study and clinical findings (C6-7 dermatome). The above-described findings would result in functional impairment, specifically in relation to heavy lifting, carrying, and left upper extremity function. The degree of such impairment will result in the following restrictions.

2.    **Please identify appropriate restrictions and/or limitations in terms of Mr. Hert's ability to sit, stand, walk, reach, lift, carry, stoop, bend, perform repetitive and fine motor hand activities, etc., based on the functional impairment(s) you have noted above. Please also not the duration of any applicable restrictions and/or limitations and the evidence supporting your opinion if not elsewhere documented.**

Given the above-described impairments, specifically as it relates to the cervical and lumbar spine, Mr. Hert would require the following restrictions:

•    Sitting continuously with the opportunity to shift or change positions every 60 minutes for a 2 to 3 minute duration.

- Lifting and/or carrying up to 20 pounds occasionally, 10 pounds frequently.
- Pushing and/or pulling up to 20 pounds maximum.
- Standing frequently up to 4 hours in total throughout the course of an 8-hour time period.
- Walking frequently up to 4 hours in total throughout the course of an 8-hour time period.
- Reaching above shoulder level restricted to an occasional basis; reaching between shoulder and waist level unrestricted; reaching below waist level restricted to an occasional basis.
- Bending, stooping, crouching, and twisting restricted to an occasional basis.
- Mr. Hert should not perform any type of repetitive flexion, extension or rotation of the cervical spine. Mr. Hert should perform no activities requiring awkward neck posturing. Static neck posturing would require him the opportunity to change positions every 60 minutes for a 2 to 3 minute duration. Any flexion, extension, or rotation should not be done at extremes.
- Repetitive and fine motor hand activities; gripping, grasping, handling, fingering, feeling, fine finger dexterity - unrestricted.

The above-described restrictions would be considered permanent in nature. Mr. Hert, as described, does have imaging study evidence and clinical findings consistent with spondylosis with ongoing pain complaints and radiation of the left upper extremity. The above-described restrictions are likely to be permanent in nature.

**3.**     **Do the medical records support significant adverse side effects (including cognitive deficit) from any medication or combination of medications(s)? If so, please specify which medication(s) and for what time period, providing evidence supporting your opinion.**

Review of the available medical records indicate that Mr. Hert has been on medications including Kadian, Vicodin, Actiq, Axert (headaches), Seroquel, and Effexor for depression. Despite the medication usage, there is no documentation or clinical restrictions consistent with any type of adverse side effects, including that of cognitive deficits, sedation, or constipation.

**4.**      **If medical records are indicating significant impairment, please comment on expected treatment, duration and prognosis. (Is improvement likely?)**

The available medical records do support impairment as described in detail in Question Number 1. Imaging study findings do reveal degenerative disc findings at C2-3, C6-7, and L4-5. Needle examination of November 29, 2005, denotes denervation of the left C6-7 nerve roots. Despite these findings, exam features suggest loss in range of motion and ongoing pain complaints, particularly of the cervical spine. Given such findings, Mr. Hert should continue to undergo ongoing pain management. It does not appear that Mr. Hert is a surgical candidate at this time. Overall, the duration is likely to be permanent in nature. Mr. Hert's prognosis is fair.

* * *

**6.      If you opine that Mr. Hert is not functionally impaired, please provide a detailed explanation supporting your opinion.**

Not applicable.[10]

Accordingly, Dr. Pasquale concluded that Mr. Hert was indeed significantly functionally impaired as a result of his cervical and lumbar spine injuries as well as his rotator cuff tear. Dr. Pasquale provided numerous restrictions and/or limitations in terms of Mr. Hert's ability to sit, stand, walk, reach, lift, carry, stoop, and bend, such restrictions appear to be consistent with those initially provided by Plaintiff's treating physician in March of 2004.

On December 5, 2006, Dr. Shipko provided a 6 page report which concluded that "the underlying depressive order and [Plaintiff's] physical conditions were not intertwined," and that "[f]rom a psychiatric perspective . . .[Plaintiff's] underlying depression never rose to a level where it caused functional impairment."[11]

In a letter dated December 22, 2006, Plaintiff communicates his subjective complaints to Prudential's claims manager during his appeal process. Plaintiff states, in pertinent part:

---

[10] *Id.*, R, pp. 126-133.

[11] *Id.*, R, pp. 122.

> As a result of the current physical, mental, and emotional disabilities, disabling symptoms, and the employment related injuries that I received while performing my job duties and responsibilities as a Franchise Development Manager for the Results Travel Agency Franchise Brand of Carlson Companies, Inc., I can not competently maintain and/or competently sustain full-time or part-time gainful employment due to these employment related injuries and debilitating symptoms, i.e. herniated discs, damaged nerve roots, nerve root impingements, and reoccurring episodes of pain, numbness, weakness, and limited motion of my cervical spine and lumbar spine radiating into the upper extremities (back of head, neck, upper back, shoulders, arms, hands, and fingers) and lower extremities (lower back, buttocks, hips, thighs, calves, and the sciatic nerves); hearing loss due to a constant ringing sound in both ears and reoccurring episodes of blurred vision, headaches, depression, anxiety, sleep depravation, erectile dysfunction, and lower abdomen pain coupled with the loss of bowel and/or bladder control that currently render me physically, mentally, and emotionally unemployable.[12]

On January 26, 2007, Prudential denied Plaintiff's appeal.

On March 2, 2007, Plaintiff's counsel, Michael Steinberg, requested a voluntary appeal of the January 26, 2007 decision finding that Plaintiff was no longer disabled. The appeal letter enclosed two new documents: (1) the Social Security Administration's decision which ruled that Plaintiff had been disabled since January 9, 2005, and (2) a January 19, 2007 report from Rehab Consulting Services prepared by Robyanne Cash-Howard, M.A.

On February 2, 2007, an Administrative Law Judge ("ALJ") entered a decision in favor of Hert. The ALJ found that Hert has the following severe impairments: degenerative disc disease (neck and back) and AC joint degenerative arthritis.[13] The ALJ concluded that

---

[12] *Id.*, R, p. 97.

[13] *Id.*, R, p. 26.

although Hert has the residual functional capacity[14] for a restricted range of sedentary work, "considering the claimant's age [54.5 years], education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform."[15] Accordingly, the ALJ concluded that Hert has been under a "disability," as defined in the Social Security Act, from January 9, 2005, through the date of the decision [February 2, 2007].[16]

On January 19, 2007, in connection with Plaintiff's worker's compensation lawsuit, Plaintiff was referred to Robyanne Cash-Howard at Rehab Consulting Services in order to perform a vocational assessment. All of Plaintiff's relevant medical records were provided as well as his current resume. The assessment states, in pertinent part:

> I had the opportunity to meet Mr. Melvin Hert on 1/19/07. Mr. Hert presented in a casually attired manner without deficits for grooming noted. He is a 56 year old, black, divorced male who resides alone in a townhome dwelling in Tampa, FL. He notes being ambidextrous performing all dextrous activities with his left arm/hand and learned writing activities with his right. Mr. Hert answered all questions posed of him but did ask for repeats due to his hearing loss. He was noted as wearing a sling on his left arm and ambulated slowly and deliberately by use of a single point cane in his right hand. He wore bilateral hearing aides and trifocal lens eyeglasses on day of interview.

---

[14] An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. In making this finding, the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 CFR 404.1520(e).

[15] *See id.*, p. 28.

[16] Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. §§ 216(I) and 223(d) of the Social Security Act.

Additional assistive devices include a hinged knee brace for his right knee, lumbar braces, and TENS unit.

\* \* \*

He is on medication: Vicodin, Imitrex, Lisinopril, Lamictal, HCTZ, Seoquil, and Effexor. He notes that he has difficulty obtaining his medication on a regular basis due to financial distress and his physician has assisted him in enrolling in a low-income program to secure his drugs. He also notes that he is supposed to be using eye drop medications for his diagnosis of glaucoma and phenergan for nausea associated with his migraine headaches but can not afford them.

\* \* \*

Mr. Hert indicated that his pain is constant but will vary in intensity based on his level of activity and usually escalates as the day goes by. He notes that he has to take medication at night to fall asleep and pain in his neck, back, and/or shoulder will awaken him through the night necessitating him to take additional medicine. He is awakened 2-3 times each night. He does not get restful sleep and notes that he finds himself becoming drowsy and/or falling asleep during the day - sometimes even becoming drowsy during driving. He does take daytime naps 3-4 times per week and they will last 2-4 hours in duration. Mr. Hert notes that reaching and grasping causes his pain to increase in the neck and upper left extremity and sometimes in the right upper extremity, too. Sitting, standing, and being in a prone position will increase his low back and leg symptoms.

\* \* \*

Mr. Hert was enrolled in classes at the University of South Florida in school year 2005-2006 but was not able to complete most of the classes enrolled within taking early withdrawal. He had much difficulty in staying in a seated position for the lecture periods, having to get up and down, comprehending and reading his assignments proved to be very hard as did trying to study for test/quizzes. He had hoped to move forward in securing a MBA degree but has not been able to study for the required GMAT.

Mr. Hert completed high school. He served in the United States Army from 1972 to 1974. He was honorably discharged after serving as a microwave repairer both Stateside and in Germany. Mr. Hert states that he sustained an injury while in the service - being involved in a MVA in 1973. He notes having a 40% disability rating for his lumbar injury, 30% for cervical injury, and unpaid disability for psychiatric. After serving in the military, he went back to school completing a bachelor of arts degree in Business Management in 1980 from Louisiana Tech and a bachelor of science degree in Business Administration in 1981 from Louisiana State University. . . .He denies have

difficulty with his ability to read and write or perform mathematical computations except his ability to concentrate and lack of and difficulty with his memory. [17]

Ms. Cash-Howard performed a transferrable skill analysis, which included an analysis of Mr. Hert's previous work history, the demand characteristics of those jobs within that work history, and the current level of functioning of his which may have been reduced by illness or injury. Upon performing a transferrable skill analysis, the following occupations where "matched" with Plaintiff's skills and sedentary requirements: Manager, Touring Production, Information Clerk, Insurance Clerk, and Credit Analyst. All matches were noted to be either "fair" or "potential."[18] At the end of the transferrable skill analysis, Ms. Cash-Howard states,

Please note that although occupations were found to have transferability within the strength category of sedentary (his highest assigned physical ability by physicians) the level of transferability is distant and due to Mr. Hert's age and non-exertional impairments may preclude him from effectively learning new skills and being able to perform the essential functions of the above noted occupations. Based on the non assigned non-exertional related restrictions, Mr. Hert would be unable to perform semi-skilled or skilled occupations. Physically he is unable to perform unskilled occupations based on assigned exertional levels.

SUMMARY:

Mr. Hert has sustained bodily injury as far back as 1973 to his lumbar and cervical spine and shoulder. His symptoms have progressed over time - with the fastest period of deterioration from 2002 to the present; now yielding him unable to work from a physical perspective per opinion of Dr. Garcia and

_____

[17] *Id.*, R, pp. 30-36

[18] "Fair Match - Includes search levels 1-8 and finds jobs that include similar work activities or jobs in similar industries as the jobs the worker has performed in the past; may require on-the-job training. Potential Match - Includes search level 9 and finds jobs the worker has the potential to perform based on education, abilities and interests; may require a career change." *Id.*, R, p. 36.

unable to work due to psychiatric symptoms by Dr. Wietzner. Additionally, he is hampered by bilateral hearing loss, visual disturbances and glaucoma, right knee pain, and hypertension.

Retraining efforts were also considered for Mr. Hert taking into account his previously achieved educational experiences, but it is felt he would not be a candidate for retraining at this time due to the known difficulties experienced by Mr. Hert most recently at USF and the noted difficulties with concentration, goal setting, planning, and meeting time frames that continue due to his diagnosis of major depression.[19]

On October 30, 2007, Prudential notified Plaintiff's counsel in writing that the prior decisions to terminate Plaintiff's claim for LTD benefits were being upheld because Prudential determined that the medical information received did not support impairment that would prevent Plaintiff from performing material and substantial duties of his own occupation or any occupation.

## II.      Standard of Review.

### A.      Summary Judgment.

ERISA benefit denial cases present courts with unique considerations. Hence, the "standard" summary judgment considerations do not apply. "Where the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists do not apply." *See Crume v. Metropolitan Life Ins.*, Co., 417 F.Supp.2d 1258, 1272 (M.D. Fla. 2006). Instead, the Court must ask whether the aggregate evidence, viewed in the light most favorable to the

---

[19] *Id.*, R, p. 36.

non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits. *Crume*, 417 F.Supp.2d at 1273.

## B.    ERISA Framework.

Since ERISA does not expressly set forth the appropriate standard of review for actions challenging benefit eligibility determinations under 29 U.S.C. § 1132(a)(1)(B), the district court examines the plan documents to determine the applicable standard of review. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989). In the past, the Eleventh Circuit has directed district courts to follow a "well-defined series of steps" in reviewing a decision to deny disability benefits in an ERISA case. *Tippett v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1231-32 (11th Cir. 2006). District courts followed the following six step analysis in reviewing an administrator's benefits decision:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, then end judicial inquiry and reverse the decision.
> (3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
> (5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.[20]

As to the sixth step in this analysis, however, the Eleventh Circuit recently eliminated the heightened standard of review applicable when a conflict of interest is present. *Doyle v. Liberty Life Assurance Co. Of Boston*, 542 F.3d 1352, 1360 (11th Cir. 2008).[21] In *Doyle*, the Eleventh Circuit overruled its precedent to "the extent it requires district courts to review benefit determinations by a conflicted administrator under the heightened standard." *Id.* The Court held that "the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious." *Id.* The Court further held that, "while the reviewing court must take into account an administrative conflict when determining whether an administrator's decision was arbitrary and capricious, the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." *Id.*

This case falls under the category of ERISA cases involving a conflict of interest because Prudential, as the administrator of the plan, also acts as a fiduciary and makes discretionary decisions, all while serving as the insurance company paying the claims out of its own assets. *See Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2343 (2008) (holding that

---

[20] *Doyle v. Liberty Life Assurance Company of Boston*, 542 F.3d 1352, 1356 (11th Cir. 2008), citing *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1138 (11th Cir. 2004).

[21] *See Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2343 (2008) (Supreme Court implicitly overruled the heightened arbitrary and capricious review).

where plan administrator is not the employer but is itself a professional insurance company, a conflict exists). Thus, pursuant to *Glenn* and *Doyle*, this Court should consider Prudential's conflict when determining whether Prudential's decision was arbitrary and capricious.

Regardless of the applicable standard of review, however, the court first evaluates the claims administrator's interpretation of the plan to determine whether it is "wrong." *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008). "Wrong," as the Eleventh Circuit uses the term in ERISA cases, means "the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the claims administrator's plan interpretation." *Id.* If the claims administrator's interpretation is "wrong," the court then decides whether "the claimant has proposed a 'reasonable' interpretation of the plan." *Lee v. Blue Cross/Blue Shield*, 10 F.3d 1547, 1550 (11th Cir. 1994). Even if the claimant's interpretation is reasonable, that does not mean he automatically prevails. *HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 992 (11th Cir. 2001). Guided by the principle of trust law that a trustee's interpretation should not be disturbed if it is reasonable, a claims administrator's wrong interpretation is arbitrary and capricious only if it is unreasonable. *HCA Health* at 992, citing *Firestone*, 489 U.S. at 110-11. The claimant bears the burden of proving that he is entitled to benefits. *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998).

## III. Discussion.

### A. Denial of Long Term Benefits.

Defendant argues that its decision to terminate Plaintiff's LTD benefits as of September 26, 2006, should be affirmed because the record demonstrates that Plaintiff does not meet the definition of being disabled from performing the duties of any gainful occupation. Plaintiff argues that Prudential's decision to terminate his LTD benefits was arbitrary and capricious because Prudential based its decision on the Plaintiff's physical limitations without considering his non-exertional limitations, including his hearing loss, fatigue, drowsiness and sedation from pain management medications.

In support of Prudential's decision that Plaintiff does not meet the definition of disabled under the Policy, Defendant points to the vocational analysis prepared by Phaela Kirchner of Kirchner & Associates on May 21, 2005. Ms. Kirchner prepared the analysis using Mr. Hert's "light duty" limitations which had been provided by Mr. Hert's treating physician in March of 2004. Through the use of a computer program, Ms. Kirchner determined that Plaintiff's skills could transfer to the following occupations: Sales Manager, Funds Development Director, Research and Development Director, and Financial Planner. Ms. Kirchner's report states, in pertinent part: "Mr. Hert has expressed interest in taking accounting courses at USF in order to take the CPA exam. He is interested in learning the

operations side of business which he believes would lead to jobs that are within his physical restrictions."[22]

During the fall of 2005, Mr. Hert did indeed register for accounting courses at USF. Mr. Hert attended several classes, however, he was unable to complete the classes due to difficulty in staying in a seated position for the lecture periods, having to get up and down, and problems with comprehending and reading his assignments.

Additionally, Prudential argues that Plaintiff had the subjective belief that he could hold a full-time position. During the fall of 2007, Plaintiff sent out resumes and attempted to participate in interviews and find a job working in the financial market. As a result of traveling by car to an out of town interview, Plaintiff claims that he experienced severe pain and discomfort and "re-injured" his back. Plaintiff was offered a customer service position with Chase Manhattan, but Plaintiff chose not to accept the job since he did not think he could handle the 250 mile round trip drive.

### 1. Court must determine whether decision was "wrong."

In considering Plaintiff's claim, this Court must decide whether Prudential's denial of benefits was "wrong." *See Glazer*, 524 F.3d 1241, 1247. After reviewing the administrative record, the Court concludes that Prudential's discretionary decision to deny Plaintiff's long term disability benefits was *de novo* wrong, as the record establishes that Plaintiff was significantly physically impaired to such a degree of severity that he could not

---

[22] *Id.*, R, 303.

perform the duties or any gainful occupation for which he is reasonably fitted by education, training or experience from September of 2006, through present.

The evidence Prudential relied upon in denying Plaintiff's request for LTD benefits is not persuasive. Although Prudential points to a computer analysis conducted in May of 2005, Plaintiff's efforts to take accounting classes during the fall of 2005, and Plaintiff's good faith attempts to find a position during the fall of 2007 as evidence that he is not entitled to continuing LTD benefits, examination of the administrative record as a whole reflects that Mr. Hert has a significant medical history for which he will have ongoing impairment presently and on a permanent basis.

The beginning of any *de novo* analysis of a disability claim is a review of the objective medical findings. Whether Plaintiff suffers from chronic injuries and impairments does not appear to be in dispute, rather the dispute lies in the level and degree of Mr. Hert's residual functional capacity to perform the duties of any gainful occupation for which he is reasonably fitted by education, training, or experience. The administrative record establishes, and Prudential does not dispute, that Plaintiff suffers from lower cervical spondylosis, disc herniation at C2-3 and C6-7 without neural impingement, disc degeneration at L4-5 associated with disc bulge producing mild thecal sac effacement, small right posterolateral disc herniation superimposed on disc bulge at L4-5, moderate left sided neural foraminal narrowing at L4-5, and chronic pain and discomfort consistent with clinical description and his complaints. The record also establishes that these injuries result in significant functional impairments, specifically in relation to heavy lifting, carrying, and left upper extremity

function.  As of December 2006, Prudential's IME, Dr. Pasquale, opined that Mr. Hert's impairments will result in the following restrictions:

- Sitting continuously with the opportunity to shift or change positions every 60 minutes for a 2 to 3 minute duration.
- Lifting and/or carrying up to 20 pounds occasionally, 10 pounds frequently.
- Pushing and/or pulling up to 20 pounds maximum.
- Standing frequently up to 4 hours in total throughout the course of an 8-hour time period.
- Walking frequently up to 4 hours in total throughout the course of an 8-hour time period.
- Reaching above shoulder level restricted to an occasional basis; reaching between shoulder and waist level unrestricted; reaching below waist level restricted to an occasional basis.
- Bending, stooping, crouching, and twisting restricted to an occasional basis.
- Mr. Hert should not perform any type of repetitive flexion, extension or rotation of the cervical spine.  Mr. Hert should perform no activities requiring awkward neck posturing. Static neck posturing would require him the opportunity to change positions every 60 minutes for a 2 to 3 minute duration.  Any flexion, extension, or rotation should not be done at extremes.
- Repetitive and fine motor hand activities; gripping, grasping, handling, fingering, feeling, fine finger dexterity - unrestricted.

The Court cannot imagine a job that would allow one to meet all of these restrictions. Apparently, neither could Ms. Cash-Howard, a vocational analyst, who, in January of 2007, opined in pertinent part: "Please note that although occupations were found to have transferability within the strength category of sedentary (his highest assigned physical ability by physicians) the level of transferability is distant and due to Mr. Hert's age and non-exertional impairments may preclude him from effectively learning new skills and being able to perform the essential functions of the above noted occupations."

In addition to Plaintiff's significant physical impairments, Plaintiff also presently suffers from non-exertional impairments, such as hearing loss in both ears, glaucoma in both eyes, and fatigue. Notably, the ALJ considered Plaintiff's non-exertional impairments when awarding Social Security Disability Benefits to Plaintiff on February 2, 2007. The ALJ found that Hert has the following severe impairments: degenerative disc disease (neck and back) and AC joint degenerative arthritis. The ALJ concluded that although Hert has the residual functional capacity for a restricted range of sedentary work, considering the claimant's age [54.5 years], education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform. Accordingly, the ALJ concluded that Hert has been under a "disability," as defined in the Social Security Act, from January 9, 2005, through the date of the decision.

Accordingly, the strong weight of the evidence in the administrative record supports Plaintiff's claim that he was unable to perform the duties of any gainful occupation for which he is reasonably fitted by education, training, or experience, from September 2006 through present.

**2.      Court must determine whether decision was arbitrary and capricious.**

The appropriate inquiry is whether there was a reasonable basis for Prudential's decision, based upon the facts as known to the administrator at the time the decision was made.

As of September 26, 2006, Plaintiff had submitted three medical opinions from treating physicians [Dr. McKitrick - November 30, 2004, Dr. Garcia - April 4, 2006, and Dr.

Weitzner - September 26, 2006] opining that Mr. Hert was permanently or indefinitely disabled from his spine injuries, preventing him from maintaining full-time or part-time employment and significantly limiting his physical abilities to perform many activities of daily living and personal care. Despite such medical opinions, Prudential terminated Plaintiff's claim for LTD benefits, effective as of September 26, 2006, based on Prudential's determination that Plaintiff no longer met the definition of being disabled, because, in its words, Plaintiff failed to submit sufficient evidence of his inability to perform the duties of "any gainful occupation."

Ignoring the more recent opinions provided by Dr. McKitrick, Dr. Garcia and Dr. Weitzner, Prudential focused on the restrictions recommended by Dr. McKitrick on March 3, 2004, and a vocational analysis conducted in May of 2005. On March 3, 2005, Dr. McKitrick recommended the following restrictions: "No lifting over ten pounds, no repetitive bending, twisting, climbing or carrying. No prolonged standing or sitting without a five minute break every hour to stretch." These were the restrictions used in conducting the 2005 vocational analysis, where Ms. Kirchner identified alternative occupations for Plaintiff [Sales Manager, Funds Development Director, Research and Development Director, and Financial Planner]. As a result of the 2005 vocational analysis, Plaintiff registered for accounting classes at USF in the hope that he might be able to become an accountant. Unfortunately, Plaintiff's injuries prevented him from completing the accounting courses, because of pain and discomfort in attending and traveling to and from class. Prudential offers Ms. Kirchner's 2005 vocational analysis and Plaintiff's [failed] attempts to achieve further education as

"evidence" that he is able to obtain gainful employment, and therefore, not disabled under the language of the Policy.

On October 17, 2006, Plaintiff appealed Prudential's decision. At this point Prudential referred the entire file to two IMEs, Dr. Pasquale and Dr. Shipko. As discussed in detail above, in December of 2006, Dr. Pasquale opined that Plaintiff was indeed significantly impaired and provided a long list of restrictions relating to Plaintiff's cervical and lumbar spine injuries, much more restrictive than Dr. McKitrick's recommended restrictions from March of 2004. Despite Dr. Pasquale's opinion that Plaintiff is significantly impaired, on January 26, 2007, Prudential denied Plaintiff's appeal.

On March 2, 2007, Plaintiff's counsel, Michael Steinberg, requested a second appeal. He submitted the Social Security Administration's decision dated February 2, 2007, and report from Rehab Consulting Services prepared by Ms. Cash-Howard dated January 19, 2007. As discussed above, the ALJ found that although Hert has the residual functional capacity for a restricted range of sedentary work, considering his age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform. Ms. Cash-Howard came to a similar conclusion after completing the 2007 vocational analysis, concluding that although occupations were found to have transferability within the strength category of sedentary the level of transferability is distant and due to Mr. Hert's age and non-exertional impairments may preclude him from effectively learning new skills and being able to perform the essential

functions of such occupations. The Court notes that during the 2007 vocational analysis, Ms. Cash-Howard utilized the restrictions recommended by Dr. Pasquale in December of 2006.

Despite this additional record information, on October 30, 2007, Prudential upheld its prior decision to terminate Plaintiff's benefits, based on its determination that the medical information received did not support impairment that would prevent Plaintiff from performing material and substantial duties of any gainful occupation.

Following *Glenn* and *Doyle* and after considering the administrator's conflict, the Court concludes that Prudential's decision was "wrong" and unreasonable, and therefore, arbitrary and capricious. The Court determines that Plaintiff was disabled and met all conditions precedent to continuing to receive long term disability benefits under the Policy from September 25, 2006 and thereafter. Defendant's motion for summary judgment is denied as to its decision to terminate Plaintiff's LTD benefits.

**B.      Reimbursement of Overpaid Disability Benefits.**

Pursuant to the Policy as well as a Reimbursement Agreement signed by Plaintiff, Prudential is entitled to reimbursement of overpaid disability benefits. From July of 2005, through October 2006, Plaintiff received Social Security Disability benefits in addition to the LTD benefits from Prudential. In the Reimbursement Agreement, Plaintiff agreed, "if any benefits under the Social Security Act are awarded retroactively, I agree to repay Prudential

immediately the amount paid to me under this Agreement in excess of the amount to which I would have been entitled under the terms of the Plan."[23]

It is undisputed that Plaintiff received $14,002.93 in Social Security Disability benefits during the period of July 1, 2005, through October 24, 2006. Accordingly, Defendant's motion for summary judgment is granted as to this issue in the amount of $14,002.93, to be deducted from any payments owed by Prudential to Plaintiff for LTD disability benefits from September 25, 2006, and thereafter.

It is therefore ORDERED AND ADJUDGED that:

1.  Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law (Dkt. #26) is **GRANTED IN PART AND DENIED IN PART** as stated herein.

2.  Since Plaintiff did not file a motion for summary judgment, this case remains on the June 2009 trial calendar and the Pre-trial Conference remains scheduled for **Thursday, May 7, 2009, at 10:15 a.m.**

**DONE** and **ORDERED** in Tampa, Florida on April 28, 2009.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Odd\2008\08-cv-233.msj 26.wpd

---

[23] *Id.*, R, pp. 337-338.